UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MILAN LIPSTEIN,<br><br>                              Plaintiff,<br><br>          -against-<br><br>20X HOSPITALITY LLC d/b/a/ SPICY<br>MOON, et al.,<br><br>                              Defendants. | 22-cv-04812 (JLR) (JW)<br><br>**<u>OPINION AND ORDER</u>** |

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Milan Lipstein ("Plaintiff" or "Lipstein") brings this action against Defendants
20X Hospitality LLC, doing business as Spicy Moon ("Spicy Moon" or the "Restaurant"), June
Kwan ("Kwan"), Joanna Avery ("Avery"), and Yidi Mao, also known as Kenny Mao ("Mao")
(collectively, "Defendants") alleging violations of Title VII of the Civil Rights Act, 42 U.S.C.
§§ 2000e, *et seq.* ("Title VII"), the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*
("FLSA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.*
("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.*
("NYCHRL"), and the New York Labor Law, N.Y. Lab. Law §§ 1, *et seq.* ("NYLL").  ECF No.
53 ("Second Amended Complaint" or "SAC").  Before the Court is Defendants' partial motion to
dismiss the Second Amended Complaint.  ECF No. 54.  For the reasons stated below, the motion
is DENIED.

# FACTUAL BACKGROUND[1]

## I.     The Parties

Plaintiff Milan Lipstein is a resident of the State of New York.  SAC ¶ 24.  Defendants employed Plaintiff from January 5, 2021 to November 8, 2021.  *Id.*

Defendant Spicy Moon is a foreign limited liability corporation that operates as a restaurant.  *Id.* ¶ 27.  Defendant June Kwan is the owner of Spicy Moon and a resident of the State of New York.  *Id.* ¶ 31.  Defendant Joanna Avery is the General Manager of Spicy Moon and a resident of the State of New York.  *Id.* ¶ 36.  Yidi Mao is the Executive Head Chef at Spicy Moon and a resident of the State of New York.  *Id.* ¶ 41.

## II.     Plaintiff's Employment at Spicy Moon

For eight years, Plaintiff worked as a chef in New York City at various restaurants.  *Id.* ¶ 46.  In light of his experience, Plaintiff was offered the role of Executive Head Chef at Spicy Moon and began working at there on January 5, 2021.  *Id.* ¶ 47.  As Executive Head Chef, Plaintiff was responsible for creating dishes for the Restaurant's menu, managing kitchen staff and inventory, and preparing food.  *Id.* ¶ 48.  Plaintiff designed several best-selling dishes and generated significant social media engagement for the Restaurant.  *Id.* ¶ 51.  Plaintiff received consistent positive feedback from the Restaurant's management about his work.  *Id.* ¶ 58.  During this period, Kwan and Avery were jointly responsible for the same tasks as Plaintiff plus additional duties as the owner and General Manager, respectively.  *Id.* ¶ 49.

Plaintiff worked seven days per week often for 16 to 18 hours per day.  *Id.* ¶ 53.  Plaintiff generally worked every day of the week from 10:00 a.m. until 4:00 a.m.  *Id.* ¶ 54.  In total, he

---

[1] Unless otherwise noted, the facts stated herein are from the SAC, which the Court accepts as true for purposes of this motion.  *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 176 (2d Cir. 2013); *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110-11 (2d Cir. 2010).

worked an average of about 119 hours per week, ranging from 112 to 126 hours per week.  *Id.* ¶ 55.  Frequently, Plaintiff personally paid for supplies, ingredients, and hardware, and management almost always failed to reimburse Plaintiff.  *Id.* ¶¶ 56-57.

Defendants employed several back-of-house employees, including line chefs, preparation cooks, and dishwashers ("Back-of-House Employees").  *Id.* ¶ 59.  The Back-of-House Employees also include other non-tipped employees, but exclude the Executive Head Chef, owners, and management.  *Id.* ¶ 60.

In September 2021, Nick Kwak, the former General Manager and minority owner of the Restaurant, hired Mao as co-Executive Head Chef, alongside Plaintiff.  *Id.* ¶ 62.  Shortly after, Kwan became the sole owner of Spicy Moon.  *Id.* ¶ 63.  Kwan then promoted Mao to the position of sole Executive Head Chef, and Plaintiff was made a Preparation Cook reporting to Mao.  *Id.*  Following the promotion, Mao became responsible for the Restaurant's menu, overseeing the kitchen staff, and all decision-making responsibilities in the kitchen.  *Id.* ¶ 64.  In his new role as a Preparation Cook, Plaintiff prepared food for customers, in addition to other duties, all under Mao's direction.  *Id.* ¶ 65.

## III.    Relationship with Mao

Plaintiff alleges that, as soon as Mao came on board, he began to physically assault and sexually harass Plaintiff on a daily basis.  *Id.* ¶¶ 1, 67.  For example, Mao grabbed Plaintiff's buttocks and put his fingers near Plaintiff's rectum while making explicit threats to rape him.  *Id.* ¶¶ 1, 72.  Plaintiff also alleges that Mao regularly made discriminatory comments about Plaintiff's Jewish heritage and faith, performing a Nazi salute while yelling "Heil Hitler" each time Plaintiff walked by.  *Id.* ¶¶ 68, 80.  Mao also grabbed Plaintiff's chest, squeezed his muscles

together, and made comments about Plaintiff gaining weight. *Id.* ¶ 73. Mao regularly said inappropriate sexual things to Plaintiff regarding male genitalia. *Id.* ¶ 74.

Mao asked Plaintiff daily if he was homosexual, hoping to have a sexual relationship with Plaintiff. *Id.* ¶ 75. Mao also threatened to rape Plaintiff and kill him on several occasions. *Id.* ¶¶ 76-77. He also placed his hand near Plaintiff's groin, made lewd gestures, and made other sexual comments. *Id.* ¶ 78. The Second Amended Complaint details the numerous antisemitic comments that Mao made to Plaintiff. *Id.* ¶¶ 81-83.

On one occasion in early October 2021, Plaintiff went to the upstairs kitchen for an ingredient when Mao was present. *Id.* ¶¶ 86-87. After Mao noticed Plaintiff in the kitchen, Mao yelled at Plaintiff: "I am going to kill you" and "[y]ou should watch your fucking back." *Id.* ¶¶ 88, 92. Mao stopped cooking, went to Plaintiff, and pointed his right index finger in Plaintiff's face while repeating: "[W]hat the fuck are you going to do?" *Id.* ¶ 90. Plaintiff asked Mao to lower his finger and tried to move away from Mao. *Id.* ¶ 91. Mao then closed his right hand into a fist and gestured at Plaintiff as if he was going to strike him, saying, "I am going to kill you." *Id.* ¶ 92. Plaintiff left the kitchen after this incident. *Id.* ¶ 93.

Later, Mao charged at Plaintiff with a clenched fist, cornering Plaintiff in the Restaurant's walk-in refrigerator. *Id.* ¶ 94. A server restrained Mao while Mao screamed: "Let me at him" and "I am going to fucking kill you." *Id.* ¶¶ 95-96. Plaintiff left the refrigerator, and then the Restaurant, waiting until he was told that Mao had left for the day before he returned. *Id.* ¶¶ 97-98.

Avery, the General Manager, was present for "most" of the conduct described above, but did not address Mao's behavior, and "often" laughed at Plaintiff during these interactions. *Id.* ¶ 99.

4

**IV.     Meeting with Kwan and Subsequent Retaliation**

In early October 2021, Plaintiff and Kwan, the owner, met to discuss new dishes for the Restaurant's menu.  *Id.* ¶ 100.  At the end of the meeting, Plaintiff raised Mao's repeated sexual assaults, threats, and antisemitic comments.  *Id.* ¶ 101.  Plaintiff alleges that Kwan sought to silence Plaintiff by threatening to fire him.  *Id.* ¶ 102.  Plaintiff claims that Kwan told him, "[i]f it is this bad, then I am going to have to let one of you go."  *Id.* ¶ 103.  Plaintiff insisted to Kwan that Mao's behavior was unacceptable and needed to be addressed.  *Id.* ¶ 109.  Kwan "doubled down on her thinly veiled threat to fire Plaintiff for complaining."  *Id.* ¶ 110.  Kwan also told Plaintiff that "the onus was on him to remedy the relationship with Mao."  *Id.* ¶ 111.  Kwan did not address Mao's behavior, reprimand Mao, investigate Plaintiff's complaint, or take any other action.  *Id.* ¶ 112.

Plaintiff went back to work with Mao, who continued his abusive behavior.  *Id.* ¶ 113.  After several hours, Plaintiff stepped outside after becoming upset with Mao's behavior.  *Id.* ¶ 114.  Avery and a server followed Plaintiff outside where Plaintiff recounted Mao's abuse.  *Id.* ¶ 115.  Plaintiff told them that Kwan had refused to address his concerns, and he was contemplating resigning from the Restaurant.  *Id.* ¶ 116.  Avery and the server asked Plaintiff not to quit.  *Id.* ¶ 117.  Avery promised Plaintiff that Mao would not be allowed to mistreat him anymore.  *Id.* ¶ 118.  Avery did not send Mao home or take any action to protect Plaintiff, and instead walked Plaintiff back to the kitchen where he was forced to continue working with Mao.  *Id.* ¶ 121-22.

The next day, Plaintiff went to Avery's office to discuss Mao's behavior again.  *Id.* ¶ 123.  Avery made "the same hollow promise to make sure Mao stopped," but did not take any action.  *Id.* ¶ 124.

Two weeks later, Plaintiff complained for the third time to Avery, who again did not take any action to remedy the situation.  *Id.* ¶ 126.  Plaintiff then complained to Kwan for the second time, and Kwan responded that she would "fix" the situation.  *Id.* ¶¶ 127-128.

Plaintiff continued to make complaints to Kwan and Avery for the next few weeks, including on November 4, 2021.  *Id.* ¶ 129.  The two assured Plaintiff they would fix the situation, but "clearly had no plans to do so."  *Id.* ¶ 130.  On November 8, 2021, Kwan informed Plaintiff that Spicy Moon was terminating his employment, effective immediately.  *Id.* ¶ 131. Kwan claimed that Spicy Moon would be outsourcing food preparation and his services were no longer needed.  *Id.* ¶ 132.  Plaintiff claims that, since he was fired, Spicy Moon has been forced to alter or remove several dishes from its menu because only he could make them.  *Id.* ¶ 133. Plaintiff also alleges that several Spicy Moon employees have contacted Plaintiff asking for advice on how to make certain dishes.  *Id.* ¶ 134.  Thus, Plaintiff claims that Kwan's explanation that the restaurant was outsourcing Plaintiff's job was a pretext for an unlawful motive.  *Id.* ¶¶ 135-36.

## V.     Payment History and Wage Violations

Plaintiff further alleges that Defendants committed wage violations against the Back-of-House Employees – including Plaintiff when he was made a Preparation Cook.  *Id.* ¶ 139. Defendants paid Plaintiff a flat salary of $85,000 per year throughout his employment.  *Id.* ¶ 140. However, Plaintiff alleges that Defendants often failed to pay him and other Back-of-House Employees on their regularly scheduled payday, Friday.  *Id.* ¶¶ 142-43.  As a result, Plaintiff alleges that he and other Back-of-House Employees suffered concrete harm, such as Plaintiff being unable to timely make rent payments in or around 2021.  *Id.* ¶¶ 143, 145.

Plaintiff also alleges that his effective hourly rate fell below the applicable state minimum wage based on the number of hours he worked. *Id.* ¶ 146. Plaintiff worked ten or more hours during most, if not all, of his workdays, yet Defendants did not pay him spread of hours pay. *Id.* ¶¶ 147-148. After Plaintiff became a Preparation Cook, Defendants never paid Plaintiff overtime compensation when he worked over 40 hours a week. *Id.* ¶ 149. As an example, during the week of October 4, 2021 to October 10, 2021, Plaintiff worked 126 hours, and longer than 10 hours each day. *Id.* ¶¶ 150, 152. Plaintiff thus contends that he should have earned $600 in regular pay, $1,935 for overtime pay, and $105 in spread of hours pay. *Id.* ¶¶ 151-52. However, Plaintiff was paid only $1,633.62. *Id.* ¶ 153.

Additionally, Plaintiff alleges that Defendants never provided him or the other Back-of-House Employees with a Notice of Pay Rate or accurate wage statements. *Id.* ¶¶ 154-155. As a result, Plaintiff alleges that he (and the others) were prevented from: "(i) realizing their true hours worked; (ii) realizing that they were underpaid; and (iii) taking appropriate action to obtain the payments due to them." *Id.* ¶ 156.

## PROCEDURAL HISTORY

Plaintiff filed his Complaint on June 8, 2022, ECF No. 1, which he amended on August 8, 2022, ECF No. 19 ("FAC"). On November 14, 2022, Defendants filed a partial motion to dismiss the FAC. ECF No. 45. On November 23, 2022, Plaintiff filed the Second Amended Complaint. ECF No. 53. On December 7, 2022, Defendants filed a partial motion to dismiss the SAC's Ninth through Sixteenth Causes of Action as to Kwan and Plaintiff's Tenth, Twelfth, Thirteenth, and Fourteenth Causes of Action as to all Defendants. ECF No. 54; *see* ECF Nos. 56 ("Br."); 60 ("Reply"). Plaintiff opposed the motion. ECF No. 58 ("Opp."). The Court denied

Defendants' motion to dismiss the FAC as moot.  ECF No. 57.  Accordingly, Defendants' partial motion to dismiss the SAC is presently before the Court.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, the facts must be sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  On a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor."  *DiFolco*, 622 F.3d at 110-11 (internal brackets omitted) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)).  The court shall not "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Accordingly, "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).

## DISCUSSION

### I.   Employer Status

Defendants urge the Court to dismiss the Ninth through Sixteenth Causes of Action against Kwan, the owner of the Restaurant, because Plaintiff has not sufficiently pleaded that Kwan is an "employer" under the FLSA.  Br. at 6-14.  Defendants claim that Plaintiff relies on

boilerplate allegations and insufficient details about Kwan's role at the Restaurant to establish

that Kwan exercised the necessary degree of control to qualify as an employer. *Id.* Defendants

further contend that Plaintiff relies on improper group pleading that does not demonstrate that

Kwan acted as an employer. *Id.* at 14-15. Plaintiff responds that his allegations as to Kwan are

sufficient to show that Kwan served as Plaintiff's employer. Opp. at 4-10. Moreover, Plaintiff

asserts that he permissibly relies on group pleadings when the facts apply to multiple

Defendants. *Id.* at 10-14.

### A. Relevant Law

"For liability to attach under the FLSA or the NYLL, a defendant must be an

'employer.'" *Ravelombonjy v. Zinsou-Fatimabay*, 632 F. Supp. 3d 239, 258 (S.D.N.Y. 2022)

(quoting *Ruixuan Cui v. E. Palace One, Inc.*, No. 17-cv-06713 (PGG), 2019 WL 4573226, at *6

(S.D.N.Y. Sept. 20, 2019)). The FLSA defines employer as "any person acting directly or

indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The

NYLL uses a nearly identical definition of the term 'employer,' and 'district courts in this Circuit

have interpreted the definition of employer under the NYLL coextensively with the definition

used by the FLSA.'" *Ravelombonjy*, 632 F. Supp. 3d at 258 (alternations adopted) (quoting

*Jianjun Chen v. 2425 Broadway Chao Rest., LLC*, No. 16-cv-05735 (GHW), 2017 WL 2600051,

at *3 (S.D.N.Y. June 15, 2017)). Accordingly, district courts have analyzed whether an

individual is an employer using the same analysis under the FLSA and NYLL. *Id.*

The Supreme Court has described the definition of "employer" under the FLSA as having

an "expansiveness." *Falk v. Brennan*, 414 U.S. 190, 195 (1973)). The Second Circuit has added

that, "[a]bove and beyond the plain language [of the statute], . . . the remedial nature of the

statute further warrants an expansive interpretation of its provisions so that they will have 'the

widest possible impact in the national economy.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d

132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).

"[T]he determination of whether an employer-employee relationship exists for purposes of the

FLSA should be grounded in 'economic reality rather than technical concepts, determined by

reference not to 'isolated factors, but rather upon the circumstances of the whole activity."

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (internal citations

omitted).

The Second Circuit has directed courts to evaluate employee-employer relationships "on

a case-by-case basis by review of the totality of the circumstances," and has "identified different

sets of relevant factors based on the factual challenges posed by particular cases" to guide this

inquiry. *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 253, 308 (S.D.N.Y. 2011) (quoting

*Barfield*, 537 F.3d at 141-42). Looking to these factors, "[i]n its narrowest form, this analysis

evaluates whether an alleged employer exercised formal control, and at its broadest it evaluates

functional control." *Hsieh Liang Yeh v. Han Dynasty, Inc.*, No. 18-cv-06018 (PAE), 2019 WL

633355, at *5 (S.D.N.Y. Feb. 14, 2019). Therefore, "the exercise of formal control over

employees is sufficient, but not necessary, to adequately allege an employer relationship." *Id.*

(quoting *Xiaoyan Liu v. Canteen 82 Inc.*, No. 17-cv-07862 (KPF), 2018 WL 6067228, at *5

(S.D.N.Y. Nov. 20, 2018)).

Starting with the "formal control test," also called the "economic reality test," a court

evaluates whether an alleged employer "(1) had the power to hire and fire the employees, (2)

supervised and controlled employee work schedules or conditions of employment, (3)

determined the rate and method of payment, and (4) maintained employment records." *Carter*,

735 F.2d at 12 (internal citation omitted); *see Barfield*, 537 F.3d 132, 142. "Formal control

'does not require continuous monitoring of employees, looking over their shoulders at all times,

or any sort of absolute control of one's employees.'"  *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.

Supp. 2d 901, 939 (S.D.N.Y. 2013) (quoting *Herman,* 172 F.3d at 139).  "No one of the four

factors standing alone is dispositive."  *Herman*, 172 F.3d at 139.

The Second Circuit has directed that "before declaring that the entity is not an employer

under the FLSA," a district court must "look beyond an entity's formal right to control the

physical performance of another's work."  *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61,

69 (2d Cir. 2003).  This test, called the functional control test, is comprised of six factors to

evaluate whether "an entity has functional control over workers even in the absence of the formal

control measured" by the economic reality test.  *Id.* at 72.  These factors include:

> (1) whether [the alleged employer's] premises and equipment were
> used for the plaintiffs' work; (2) whether [the employer's
> contractors] had a business that could or did shift as a unit from
> one putative joint employer to another; (3) the extent to which
> plaintiffs performed a discrete line-job that was integral to [the
> alleged employer's] process of production; (4) whether
> responsibility under the contracts could pass from one
> subcontractor to another without material changes; (5) the degree
> to which [the alleged employer] or [its] agents supervised
> plaintiffs' work; and (6) whether plaintiffs worked exclusively or
> predominately for [the alleged employer].

*Id.*  Like the economic reality test, the functional control test is not a "rigid rule for the

identification of an FLSA employer."  *Barfield*, 537 F.3d at 143.  A district court is "free to

consider any other factors it deems relevant to its assessment of the economic realities" of an

alleged employer-employee relationship.  *Zheng*, 355 F.3d at 71-72.

## B.  Analysis

Turning to Plaintiff's allegations, Plaintiff asserts that Kwan is the owner of the

Restaurant and "controlled and directed the terms of employment and compensation" for

Plaintiff starting in January 2021.  SAC ¶¶ 31-32.  From September 2021 onward, Kwan

"established, implemented, disseminated, and controlled the employment polices applicable to

11

Plaintiff," including "timekeeping, work allocation, task supervision, monitoring work product, and payroll." *Id.* ¶ 33.  During that same period, Kwan had the authority to hire, fire, discipline, and promote Plaintiff.  *Id.* ¶ 34.  When Plaintiff was hired, Kwan explained his responsibilities to him, including that Plaintiff was responsible for designing dishes for the Restaurant's menu, managing the kitchen staff, preparing dishes, and maintaining inventory.  *Id.* ¶ 48.  In or around September 2021, Kwan became the sole owner of the Restaurant, promoted Mao to Executive Head Chef, and made Plaintiff Preparation Cook.  *Id.* ¶¶ 62-63.

Plaintiff complained to Kwan about Mao's behavior in October 2021.  *Id.* ¶¶ 100-101. Plaintiff alleges that Kwan sought to "silence" Plaintiff by threatening to fire him.  *Id.* ¶ 102. Kwan told Plaintiff to remedy the relationship with Mao instead of taking action.  *Id.* ¶¶ 111-112. Plaintiff complained to Kwan a second time and Kwan said that she would "fix the situation.  *Id.* ¶¶ 127-128.  Kwan met with Plaintiff and told him that the Restaurant was terminating his employment.  *Id.* ¶ 131.  These allegations are sufficient to satisfy the formal control test. Plaintiff clearly pleaded that Kwan had the power to hire and fire him.  *Id.* ¶ 34.  Specifically, Plaintiff claims that after Kwan became the sole owner she changed Plaintiff's job title from Executive Head Chef to Preparation Cook.  *Id.* ¶¶ 62-63.  Kwan later met with Plaintiff to tell him the Restaurant was terminating his position.  *Id.* ¶ 131.

Plaintiff also sufficiently alleges that Kwan "supervised and controlled employee work schedules or conditions of employment."  *Carter*, 735 F.2d at 12.  Plaintiff states that Kwan controlled employment policies such as "timekeeping, work allocation, task supervision, monitoring work product, and payroll."  *Id.* ¶ 33.  Plus, Kwan specifically instructed Plaintiff as to his job duties when he was hired.  *Id.* ¶ 48.

Turning to the last two factors, Plaintiff's pleadings are less specific about whether Kwan "determined the rate and method of payment" and "maintained employment records." *Carter*, 735 F.2d at 12. Nevertheless, Plaintiff's allegations that Kwan was in control of "timekeeping" and "payroll," interpreted in the light most favorable to Plaintiff, could be understood to overlap with these factors. SAC ¶ 33.

Defendants assert that Plaintiff's allegations are boilerplate and not sufficiently detailed. Br. at 8-14. To start, Defendants claim that Plaintiff did not include enough details about how Kwan controlled the terms and conditions of Plaintiff's employment aside from describing Plaintiff's job duties and stating that the Restaurant was terminating his position. *Id.* at 8. Defendants then include a litany of facts they believe should have been included in the complaint such as Kwan's "role and involvement of Kwan in hiring Plaintiff, issuing the Plaintiff's work assignments, the method or manner by which the Plaintiff was paid, establishing his pay rate, the assignment of the Plaintiff's job responsibilities or tasks for the day, week, or other time increment, or in maintaining employment records." *Id.* However, Defendants ignore the allegations that Kwan determined the terms of employment and compensation including setting policies about "timekeeping, work allocation, task supervision, monitoring work product, and payroll." SAC ¶ 33. Kwan also had the authority to hire, fire, discipline, and promote Plaintiff. *Id.* ¶ 34. After Kwan became sole owner, he changed Plaintiff's position, and later terminated Plaintiff's employment. *Id.* ¶¶ 63, 131. When Plaintiff complained to Kwan about the harassment he was facing, Kwan threatened to fire him. *Id.* ¶¶ 100-102. That Plaintiff also sought out Kwan to discuss the conditions of his employment, such as the harassment he faced at work, and expected Kwan to act, illustrates Kwan's power in the workplace. *Id.* ¶¶ 101, 127-128. Aside from the facts that Defendants overlooked, Defendants' list of missing facts overly

formalizes the "economic reality" test, which is not dependent on one factor and is based on the totality of the circumstances. *See Barfield*, 537 F.3d at 141-42.[2]

Even if some of Plaintiff's allegations could be considered boilerplate or "thin," the allegations "are sufficient at this stage to qualify" Kwan as an employer because, "[r]eading the allegations together," Plaintiff has plausibly alleged that Kwan acted as his employer. *Markovic v. Milos Hy, Inc.*, No. 22-cv-01412 (LJL), 2023 WL 4763807, at *14 (S.D.N.Y. July 26, 2023).

Defendants next argue that Plaintiff refers to Defendants collectively in the Second Amended Complaint and therefore fails to differentiate Kwan's conduct from the actions of other Defendants. Br. at 14-15. Plaintiff alleges that he relies on group pleadings only when the facts applied to multiple Defendants. Opp. at 10-11. In addition, according to Plaintiff, the SAC contains sufficient allegations about Kwan individually. *Id.* at 11-14.

Rule 8 requires pleadings to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). While Rule 8 "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)). A plaintiff may not "lump[] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct." *Id.* "Such a deficient pleading is called improper 'group pleading.'"

---

[2] Because Plaintiff has adequately pleaded that Kwan exercised formal control over his employment, it is not necessary for the Court to analyze whether Kwan exercised "functional" control." *Cf. Zheng*, 355 F.3d at 72 (applying a functional control analysis "in the absence of the formal control measured by the *Carter* factors").

*Plusgrade L.P. v. Endava Inc.*, No. 21-cv-01530 (MKV), 2023 WL 2402879, at *3 (S.D.N.Y. Mar. 8, 2023).

As the Court has already described at length above, the Second Amended Complaint contains sufficient allegations about Kwan, identified individually, to support a finding that Kwan was Plaintiff's employer.  While the Second Amended Complaint does make allegations about "Defendants" collectively, the Court has found that Plaintiff has sufficiently pleaded that Kwan was his employer even without reference to those allegations.

Defendants contend that there are only two allegations with respect to Kwan: that she "told Plaintiff his general job duties, and then informed him that Spicy Moon was terminating him."  Br. at 14.  But Defendants ignore several allegations specifically about Kwan's control over workplace policies, the allegation that Plaintiff turned to Kwan to resolve alleged workplace harassment, and that Kwan threatened to fire Plaintiff after he complained to Kwan, among other allegations discussed above.  SAC ¶¶ 101-103, 110.

Accordingly, the Court denies Defendants' motion to dismiss claims Nine through Sixteen against Kwan.

## II.   NYLL § 195 Claims under the Wage Theft Prevention Act ("WTPA")

Defendants next move to dismiss Plaintiff's Thirteenth and Fourteenth Causes of Action under sections 195(1) and 195(3) of the NYLL, respectively.  Br. at 15-18.  The Thirteenth Cause of Action under § 195(1) seeks statutory damages for failure to provide Plaintiff with a notice containing items such as the rate of pay and the basis for payment (for example, by the hour, shift, day, salary, or commission) that is required to be provided to employees at certain times.  SAC ¶¶ 303-310.  The Fourteenth Cause of Action under § 195(3) alleges that Defendants failed to provide Plaintiff with accurate and complete wage statements with his

payments of wages.  *Id.* ¶¶ 311-318.  Defendants argue that Plaintiff does not have Article III

standing under *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), to bring these claims

because Plaintiff has not suffered concrete injury in fact from the alleged violations.  Br. at 15-

18.  Defendants contend that while the failure to provide the notice of pay rate and accurate wage

statements may be an injury in law, this violation of a statutory notification requirement does not

create an injury in fact.  *Id*. at 16.  Thus, Defendants seek dismissal of these claims.

Defendants' argument is a familiar one that has been consistently raised in wage and hour

cases since *TransUnion* was decided in 2021.  Courts within this Circuit, and even within this

District, have come to differing conclusions.  *Compare Metcalf v. TransPerfect Translations*

*Int'l, Inc.*, No. 19-cv-10104 (ER) (KHP), 2023 WL 2674743, at *6-7 (S.D.N.Y. Mar. 29, 2023)

("*Metcalf II*") (finding standing to bring NYLL § 195 claim after *TransUnion*), *Bueno v.*

*Buzinover*, No. 22-cv-02216 (PAE) (KHP), 2023 WL 2387113, at *3 (S.D.N.Y. Mar. 7, 2023)

(same), *Mateer v. Peloton Interactive, Inc.*, 22-cv-00740 (LGS), 2022 WL 2751871, at *2

(S.D.N.Y. July 14, 2022) (same), *and Thompson v. Elev8 Ctr. N.Y.*, No. 20-cv-09581 (PGG)

(JLC), 2023 WL 4556045, at *8-9 (S.D.N.Y. July 17, 2023) (same), *with Munoz v. Grp. US*

*Mgmt.*, No. 22-cv-04038 (MKV), 2023 WL 5390204, at *6 (S.D.N.Y. Aug. 22, 2023) (finding

no standing to bring NYLL § 195 claim after *TransUnion*), *Lucero v. Shaker Contractors, Corp.*,

No. 21-cv-08675 (LGS), 2023 WL 4936225, at *3 (S.D.N.Y. July 27, 2023) (same), *Ramirez v.*

*Urion Constr. LLC*, --- F. Supp. 3d ---, 2023 WL 3570639, at *8-9 (S.D.N.Y. May 19, 2023)

(same), *Neor v. Acacia Network, Inc.*, No. 22-cv-04814 (ER), 2023 WL 1797267, at *4

(S.D.N.Y. Feb. 7, 2023) (same), *Pinzon v. 467 Star Deli*, No. 22-cv-06864 (JGK) (SLC), 2023

WL 5337617, at *11 (S.D.N.Y July 31, 2023) (same), *report and recommendation adopted*, 2023

WL 5334757 (S.D.N.Y. Aug. 18, 2023), *Reyes v. Coppola's Tuscan Grill, LLC*, No. 21-cv-

07040 (AT) (SN), 2023 WL 4303943, at *6 (S.D.N.Y. June 13, 2023) (same), *report and*

*recommendation adopted,* 2023 WL 4304676 (S.D.N.Y. June 30, 2023), *Kuan v. Notoriety Grp.*

*LLC*, No. 22-cv-01583 (JLR) (KHP), 2023 WL 3937317, at *9-10 (S.D.N.Y May 22, 2023)

(same), *report and recommendation adopted,* 2023 WL 3936749 (S.D.N.Y. June 9, 2023), *Gao*

*v. Umi Sushi*, No. 18-cv-06439 (ALC) (SN), 2023 WL 2118203, at *7 (S.D.N.Y. Jan. 31, 2023)

(same), *report and recommendation adopted*, 2023 WL 2118080 (S.D.N.Y. Feb. 17, 2023),

*Hernandez v. 99 Thai Playground*, No. 19-cv-01257 (ALC) (SN), 2022 WL 18539303, at *7

(S.D.N.Y. Nov. 28, 2022) (same), *report and recommendation adopted*, 2023 WL 1400626

(S.D.N.Y. Jan. 31, 2023), *and Pastrana v. Mr. Taco LLC*, No. 18-cv-09374 (GBD) (SN), 2022

WL 16857111, at *7 (S.D.N.Y. Sept. 23, 2022) (same), *report and recommendation adopted*,

2022 WL 16857107 (S.D.N.Y. Nov. 10, 2022).  The Second Circuit has not yet addressed this

particular issue.

### A.  Article III Standing

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States'

extends only to certain 'Cases' and 'Controversies.'"  *Lacewell v. Off. of Comptroller of*

*Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III §§ 1-2).  "'One element

of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing

to sue.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521

U.S. 811, 818 (1997)).  Satisfying this requirement is a "threshold question in every federal

case."  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Warth v. Seldin*,

422 U.S. 490, 498 (1975)).  To establish standing, a plaintiff must demonstrate "(1) an 'injury in

fact,' (2) a 'causal connection' between that injury and the conduct at issue, and (3) a likelihood

'that the injury will be redressed by a favorable decision.'"  *Maddox v. Bank of N.Y. Mellon Tr.*

*Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The burden lies with a plaintiff to demonstrate standing since the plaintiff is the party "invoking federal jurisdiction." *TransUnion*, 141 S. Ct. at 2207.  At the motion to dismiss stage, the plaintiff "bears the burden of alleging facts that affirmatively and plausibly suggest" they have standing.  *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015)).  Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Thus, a federal court may not "exercise supplemental jurisdiction over a [state law] claim that does not itself satisfy the[] elements of the Article III inquiry."  *Id.* at 351-52.

Importantly, in the context of statutory violations, the Supreme Court clarified in *TransUnion* that a plaintiff does not have standing unless the plaintiff has suffered concrete harm pursuant to Article III.  141 S. Ct. at 2205.  The Supreme Court held that, while Congress may create statutory causes of action, "under Article III, an injury in law is not an injury in fact" and "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.*  A "concrete" harm is something with at least a "'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts – such as physical harm, monetary harm, or various intangible harms."  *Id.* at 2200 (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340-41, (2016)).

## B.  Analysis

Plaintiff alleges here that Defendants violated the notice and wage statement requirements of Section 195(1) and 195(3) and that he was injured in fact by such violations because Plaintiff (and other Back-of-House Employees) were "prevented from: (i) realizing their

true hours worked; (ii) realizing they were underpaid; and (iii) taking appropriate action to obtain the payments due to them."  SAC ¶ 156; Opp. Br. at 17.  The Court agrees that Plaintiff has adequately pleaded injury in fact here.

Plaintiff has plausibly alleged that he was monetarily harmed because he did not receive information about his rate of pay and accurate wage statements, as required by the statute, which hurt his ability to assess whether he was being properly paid and therefore promptly raise issues of underpayment with his employer.  Plaintiff was therefore monetarily harmed by being deprived of his income for longer than he would have been had he been able to timely raise his underpayment earlier.  This harm is a tangible downstream consequence of the failure to receive required information.  *See TransUnion*, 141 S. Ct. at 2214 (holding that informational injury requires "downstream consequences" from failing to receive information (internal citation omitted)).

In *TransUnion*, the Supreme Court evaluated so-called disclosure and summary-of-rights claims that TransUnion "breached its obligations to provide [the plaintiffs] with their complete credit files upon request" because the files sent initially omitted requisite OFAC information, and the subsequent mailings failed to include a "summary of rights."  *Id.* at 2213.  The Court acknowledged that "the disclosure and summary-of-rights requirements [of the FCRA] are designed to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties."  *Id.*  In the context of discussing the lack of a concrete "informational injury," the Supreme Court held that the plaintiffs who received information from the credit reporting agency in the wrong format were not injured because they had not demonstrated any "downstream consequences" from

failing to receive the required information, such as that the "alleged information deficit hindered their ability to correct erroneous information before it was later sent to third parties." *Id.* at 2214.

This is precisely what Plaintiff alleges here – that he was hindered in his ability to contest the wage and hour deficiencies to which he was subjected by his employer. *See Bueno*, 2023 WL 2387113, at *3 (finding a "concrete and particularized injury sufficient to confer standing for . . . WPTA wage and notice statement claims" because "[d]enying an employee such notices – as alleged here – can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay"); *see also Thompson*, 2023 WL 4556045, at *9 (recommending that the court find standing to bring WTPA claims because plaintiffs specifically alleged that the WTPA violations "'actually harmed' them by depriving them of the 'ability to contest [wage] calculations' . . . , resulting 'in delayed payment of all proper wages'").

The Court is not persuaded that, for purposes of standing, Plaintiff must allege a harm that is "greater than Defendants' minimum wage, overtime and spread of hours wage violations" as some courts have suggested. *Pastrana*, 2022 WL 16857111, at *7; *see Munoz*, 2023 WL 5390204, at *6. The delay in compensation that results when someone lacks the full information needed to advocate for appropriate wages deals an injury that is distinct from any underpayment itself. *See Ramirez*, 2023 WL 3570639, at *7 (holding in the context of another NYLL provision that "workers paid on an untimely basis necessarily incur a concrete harm due to the time value of money").

Defendants take issue with the injury alleged because employees such as Plaintiff could keep track of their own hours, Plaintiff asserts that he generally worked from 112 to 126 hours per week, and he received paystubs that provided at least the amount he was paid. Br. at 18.

Therefore, Plaintiff could calculate his wages to see if Defendants were complying with the law and raise any issues.  *Id.*  Indeed, Defendants argue, that is precisely what Plaintiff did in bringing the present action.  *Id.*

The Court is not persuaded by this argument.  Plaintiff's recollection of the approximate time that he worked, *see* SAC ¶ 55, is not a substitute for the actual wage statements required under Section 195 that would have provided Plaintiff with precise information, along with the required notices on rate of pay, by which he alleges that he could have assessed more promptly and accurately the purported deficiencies in Defendants' payments of overtime, minimum wage, and spread of hours pay, especially given that Plaintiff alleges that he was a non-exempt employee, *see id.* ¶¶ 274, 290.  These factual allegations provide a plausible basis to suggest that Plaintiff has standing, which is all that is required at this point.  *See Calcano*, 36 F.4th at 75 (stating that, on a motion to dismiss, the plaintiff must allege facts that "affirmatively and plausibly suggest" that the plaintiff has standing to sue).  That Plaintiff ultimately brought suit here shows not that he was unharmed by the statutory violations, but rather that he seeks recompense for past injury suffered – injury for which the contours could have been more precisely determined (and which Plaintiff alleges he could have raised earlier and more clearly with his employer or before the Court) if Defendants had not violated their statutory obligation to provide Plaintiff with accurate wage statements and notice.

The Court is not persuaded by Defendants' contention, for the first time on reply, that there was no harm because the illustrative wage statement provided by Plaintiff as Exhibit A to the Second Amended Complaint complies with Section 195(3) for exempt employees such as Plaintiff, and no statements were provided by Plaintiff for non-exempt workers.  Reply at 7-8. To the contrary, Plaintiff pleads that he is a non-exempt employee entitled to overtime, *see* SAC

¶¶ 274, 290, and Defendants' contention otherwise is not sufficient in the context of a motion to dismiss where the Court must accept as true the facts alleged in the Second Amended Complaint. *See Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 85 (2d Cir. 2021). Defendants did not move to dismiss the Section 195(3) claims on the ground that accurate wage statements were in fact provided to Plaintiff, as they now seem to assert for the first time on reply. *See* Br.; *see also Aviva Trucking Special Lines v. Ashe*, 400 F. Supp. 3d 76, 80 (S.D.N.Y. 2019) ("Generally, 'a court should not consider arguments that are raised for the first time in a reply brief.'" (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006))). Instead, they argued that deficient statements do not provide a basis for Article III standing, *see* Br. at 16, an argument that this Court rejects based on the allegations in the Second Amended Complaint.

Discovery may ultimately bear out that the allegedly insufficient wage statements and notices did not actually hinder Plaintiff and others from raising issues regarding underpayment, given their reliance on the statements, the information that they had from other sources, or otherwise. But, at this juncture, the factual basis has been pleaded for such an injury that would allow the Court to draw a reasonable inference that there is standing.

Defendants' reliance on *Metcalf v. TransPerfect Translations International Inc.,* 632 F. Supp. 3d 319 (S.D.N.Y. 2022) ("*Metcalf I*"), does not take into account the subsequent proceedings in that case. *See generally* Reply at 8. While it is true that the court in *Metcalf I* initially dismissed the Section 195 claim for lack of standing, *see* 632 F. Supp. 3d at 330, 341, the court ultimately rejected a subsequent motion to dismiss the claim for lack of standing after plaintiff repleaded that he received inaccurate wage notices that prevented him from determining that he had been underpaid for overtime, *see Metcalf II,* 2023 WL 2674743, at *6-7. In addressing *TransUnion*, the *Metcalf II* court stated that, because plaintiffs did not receive the

appropriate wage notices and statements, they "are similar to the subset of *TransUnion* class members whose erroneous information *was* shared and who *did* have standing." *Id.* at *6. Concrete harm existed because plaintiffs "received inaccurate wage notices, which did not include a tabulation of hours and overtime, and which thereby prevented them from knowing whether, and to what extent, they had been underpaid" during a nine-month period. *Id.*

Moreover, this is not a case where the plaintiff has alleged a bare technical violation of Section 195 that could not have created concrete harm, such as the failure to include the employer's phone number or address in the notice or statements. *See, e.g.*, *Castro v. PPG Indus., Inc.*, No. 21-55340, 2022 WL 3681305, at *1 (9th Cir. Aug. 25, 2022) (finding no Article III standing to bring wage notice claim under California labor law because the alleged violation was only that the statement listed the address of the parent company, rather than that of the direct employer where the plaintiff physically worked).

Finally, this case is distinguishable from those where the plaintiffs' Section 195 claims are dismissed for lack of standing because the plaintiffs alleged nothing more than a statutory violation and request for damages, including those relied upon by Defendants from the Eastern District of New York. *See* Br. at 15; *see also, e.g., Montalvo v. Paul Bar & Rest. Corp.*, No. 22-cv-01423 (JLR) (SN), 2023 WL 5928361, at *3 (S.D.N.Y. Sept. 12, 2023) (finding that a plaintiff "lacks standing to recover for a wage notice or statement violation under § 195 when the plaintiff pleads nothing more than the statutory violation and a demand for damages"); *Kuan*, 2023 WL 3937317, at *10 (finding no standing for Section 195 claim because the plaintiff "d[id] not assert any other facts describing the injury in fact caused by not receiving these documents"); *Hernandez*, 2022 WL 18539303, at *7 (finding lack of standing where "Hernandez alleges only a technical statutory violation, and not a physical, monetary, or cognizable harm"); *Ramirez*, 2023

WL 3570639, at *9 (dismissing WTPA claim for lack of standing because "[p]laintiffs merely allege that Defendants 'failed to provide' them with required wage notices or wage statements and that, '[a]s a result of these violations,' Plaintiffs 'seek' damages, and 'Defendants are liable' to Plaintiffs"); *Lucero*, 2023 WL 4936225, at *3 ("Plaintiffs have alleged no concrete harm that they suffered due to Defendants' failure to provide them wage records."); *Sevilla v. House of Salads One LLC*, No. 20-cv-06072 (PKC) (CLP), 2022 WL 954740, at *1, 7 (E.D.N.Y. Mar. 30, 2022) (finding no standing where the plaintiff alleged that the defendants did not provide accurate wage statements or rate of pay notices but there were no allegations of a tangible injury as a result of the technical statutory violations); *Wang v. XBB, Inc*., No 18-cv-07341 (PKC) (ST), 2022 WL 912592, at *13 (E.D.N.Y. Mar. 29, 2022) ("Plaintiff has not linked any injury-in-fact to Defendants' failure to provide statutory notices under the NYLL, so she lacks standing to recover on that claim."); *Francisco*, 2022 WL 900603, at *7 ("[N]either Plaintiff nor the record demonstrate how those technical violations led to . . . a tangible injury . . . .").

Therefore, the Court finds that Plaintiff has sufficiently alleged standing to bring claims under Section 195(1) and 195(3), and it denies Defendants' motion to dismiss the Thirteenth and Fourteenth Causes of Action.

### III.   FLSA and NYLL § 191 Late Payment Claims

Finally, Defendants move to dismiss Plaintiff's Tenth and Twelfth Causes of Action for failure to pay timely wages under the FLSA and NYLL, respectively.  Br. at 18-21.  Defendants argue that (1) the NYLL does not authorize late payment claims; (2) Plaintiff has failed to set forth sufficient facts to support a claim that Defendants paid him in an untimely manner; and (3) Plaintiff lacks standing to assert his late payment claims.  *Id.*  Plaintiff contends that recovery is

authorized under the law and the Second Amended Complaint is sufficiently detailed at this stage.  Opp. at 21-25.

### A. Relevant Law

The FLSA does not explicitly prescribe a payment schedule, but "it is clear that the FLSA requires wages to be paid in a timely fashion." *Rogers v. City of Troy*, 148 F.3d 52, 57 (2d Cir. 1998); *see also* 29 U.S.C. § 206(a).  What constitutes a timely payment "must be determined by objective standards," not just by "reference to the parties' contractual arrangements." *Rogers*, 148 F.3d at 57.  On the other hand, the New York Labor Law explicitly states that "clerical and other worker[s]" must be "paid the wages earned in accordance with the agreed terms of employment, but not less frequently than semi-monthly, on regular pay days designated in advance by the employer."  N.Y. Lab. Law § 191(1)(d).  On motions to dismiss, courts in this Circuit have analyzed the two statutes together.  *See Sarit v. Westside Tomato, Inc.*, No. 18-cv-11524 (RA), 2020 WL 1891983, at *4 (S.D.N.Y. Apr. 16, 2020) (collecting cases).

### B. Analysis

Defendants first argue that the NYLL does not authorize Plaintiff to recover for late payment claims.  Br. at 19.  The Court disagrees.  As Plaintiff points out, the First Department has held that "Labor Law § 198 (1-a) expressly provides a private right of action for a violation of Labor Law § 191." *Vega v. CM & Assocs. Constr. Mgmt., LLC*, 107 N.Y.S.3d 286, 288 (1st Dep't 2019).  Just as liquidated damages are available under § 198(1-a) in cases of nonpayment or partial payment of wages, they are also available "to provide a remedy to workers complaining of untimely payment of wages." *Id.*  While the Court of Appeals has not yet spoken on the question, district courts in this Circuit have followed *Vega*'s construction of the NYLL. *See Levy v. Endeavor Air Inc.*, 638 F. Supp. 3d 324, 332 (E.D.N.Y. 2022) (collecting cases); *Pozo v. BlueMercury, Inc.*, No. 22-cv-07382 (VEC), 2023 WL 4980217, at *4-5 (S.D.N.Y. Aug.

25

3, 2023) (following *Vega* in holding that section 198(1-a) provides a private right of action for untimely wage payments pursuant to section 191); *Rankine v. Levi Strauss & Co.*, --- F. Supp. 3d --- , 2023 WL 3582323, at *4-6 (S.D.N.Y. May 22, 2023) (same).  Ignoring this trend of cases and the *Vega* decision altogether, Defendants cite (Br. at 19) only to a two-sentence footnote in a pre-*Vega* 2014 report and recommendation stating that "it seems that [NYLL § 198(1-a)] is geared to afford relief for unpaid wages, not for late-paid wages," a premise that has now been rejected by *Vega* and numerous cases that have followed.  *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 360 n.22 (S.D.N.Y. 2014).  Thus, the Court rejects Defendants' argument that the New York Labor Law does not authorize recovery for Plaintiff's late payment claims.

Defendants next argue that Plaintiff did not plead his late payment claims with sufficient detail.  Br. at 19-21.  Defendants argue that Plaintiff's pleading lacks details as to, for example, when the payments were late, how much of Plaintiff's pay was late, how often pay was late, or when the money was received for the late payments.  *Id.*  Defendants raise the bar and require far more detail than is necessary to defeat a motion to dismiss.  The Second Amended Complaint alleges that Defendants established payday as the Friday following each workweek.  SAC ¶ 142. Plaintiff alleges that Defendants "often failed to pay" its employees on this scheduled day.  *Id.* ¶ 143.  Plaintiff offers as an example a time in or around 2021 when he "was unable to timely make rent payments . . . because Defendants failed to provide[] Plaintiff with all of his earned wages on his regularly scheduled paydays."  *Id.* ¶ 145.  These allegations are sufficient to survive a motion to dismiss because they provide enough detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Alexander v. N.Y.C. Dep't of Educ.*, No. 19-cv-

07023 (AJN), 2020 WL 7027509, at *3 (S.D.N.Y. Nov. 30, 2020) ("A plaintiff is not required to provide 'detailed factual allegations' in the complaint." (quoting *Twombly*, 550 U.S. at 555)); *Savor Health, LLC v. Day*, No. 19-cv-09798 (RA), 2022 WL 912236, at *3, 7 (S.D.N.Y. Mar. 29, 2022) (deeming sufficient for a late wages claim the allegation that defendant "paid [plaintiff] less frequently than monthly").

The Court rejects Defendants' attempt to contrast this case with the "factual detail" set forth in *Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 426 (S.D.N.Y. 2017), where the plaintiff alleged that her employer withheld her paychecks on various occasions and refused to give the plaintiff a paycheck "until 9pm whereby [the p]laintiff could not deposit the check until the following business day [] to pay off a tax liability." Reply at 10 (internal citation omitted). Here, Plaintiff has pleaded that Defendants often failed to pay wages on the scheduled pay day and that he was unable to pay rent as a result in some instances, *see* SAC ¶¶ 142-143, 145, facts not dissimilar to the level of detail in *Gaughan*.[3]

Finally, Defendants suggest that Plaintiff does not have standing to bring these claims because he has not alleged a sufficiently concrete harm from the purported late payments. *See* Br. at 19-20. Again, the Court does not agree.

As discussed above, the Supreme Court held in *TransUnion* that monetary harms "readily qualify as concrete injuries under Article III." 141 S. Ct. at 2204. Plaintiffs who were paid late

---

[3] In support of their argument that the Second Amended Complaint is too "conclusory," Defendants cite only to *Rosario v. Icon Burger Acquisition LLC*, No. 21-cv-04313 (JS) (ST), 2022 WL 198503, at *4 (E.D.N.Y. Jan. 21, 2022) ("*Rosario I*"). Br. at 19. In *Rosario I*, however, the Court was not addressing whether the plaintiff had stated a claim for late wages, but instead was concerned with whether the plaintiff had adequately pleaded that he suffered concrete harm from the late payments sufficient to establish standing. *Id.* at 3. And, even with respect to standing, the court later found the plaintiff's amended complaint sufficient to allege standing. *See Rosario v. Icon Burger Acquisition LLC*, No. 21-cv-04313 (JS) (ST), 2022 WL 17553319, at *3-4 (E.D.N.Y. Dec. 9, 2022) ("*Rosario II*").

under the FLSA and NYLL have standing because the alleged harm – the late payment of

wages – is itself a concrete injury.  Since *TransUnion*, courts in this Circuit have held that

alleged late payment claims, on their own, establish standing because plaintiffs are deprived of

the time value of money.  *See, e.g.*, *Gillett v. Zara USA, Inc.*, No. 20-cv-03734 (KPF), 2022 WL

3285275, at *6 (S.D.N.Y. Aug. 10, 2022) ("Irrespective of the fact that Plaintiff ultimately

received the entire sum of wages he was owed, this delay of payment, in and of itself, constitutes

a concrete harm that suffices for purposes of Article III."); *Pozo*, 2023 WL 4980217, at *2 ("The

loss of the time value of money resulting from delay of payment is, by itself, sufficient to

constitute a concrete injury . . . ."); *Ramirez*, 2023 WL 3570639, at *7 (noting that a "majority of

courts in this Circuit also have held that workers paid on an untimely basis necessarily incur a

concrete harm due to the time value of money and thus have standing to claim damages" for

untimely wages); *Bueno*, 2023 WL 2387113, at *3 (finding standing to bring late wages claim

even though plaintiff alleged only a technical violation of § 191 because "temporary deprivation

of wages results in the concrete injury of the loss of the time value of money"); *Georgiou v.

Harmon Stores, Inc.*, No. 22-cv-02861 (BMC), 2023 WL 112805, at *2 (E.D.N.Y. Jan. 5, 2023)

(finding that the plaintiff had standing to bring late wages claim because "[n]ot having money

you're supposed to have means that the time value of money has decreased," and "[t]hat is

sufficient to establish an actual and concrete injury"); *Jones v. Nike Retail Servs., Inc.*, No. 22-

cv-03343 (PKC), 2022 WL 4007056, at *1 (E.D.N.Y. Aug. 30, 2022) ("Temporary deprivation

of money to which a plaintiff has a right constitutes a sufficient injury in fact to establish Article

III standing." (quoting *Caul v. Petco Animal Supplies, Inc.*, No. 20-cv-03534 (RPK) (SJB), 2021

WL 4407856, at *4 (E.D.N.Y. Sept. 27, 2021))); *Confusione v. Autozoners, LLC*, No. 21-cv-

00001 (JMA) (AYS), 2022 WL 17585879, at *1 (E.D.N.Y. Dec. 12, 2022) (finding allegations

that the plaintiffs were deprived through late payments of the "time value of money" sufficient to plead standing); *Levy*, 638 F. Supp. 3d at 329 (finding concrete harm from the plaintiffs' allegation "that they were temporarily deprived of – or, in other words, that they lost out on the time value of – money to which they were legally entitled").

Here, not only has Plaintiff alleged that he (and other Back-of-House Employees) were "deprived of money to which they had a right, thereby costing them the time value of their money," but Plaintiff also alleges that they were "deprived of the opportunity to invest their money" and were "otherwise unable to use their wages to pay bills and satisfy other financial obligations."  SAC ¶ 144.  Plaintiff provides the example that, on at least one occasion, he could not "timely make rent payments . . . because Defendants failed to provide[] Plaintiff with all of his earned wages on his regularly scheduled paydays."  *Id.* ¶ 145.  These allegations are plainly sufficient to establish standing for Plaintiff's late payment claims.  *See, e.g.*, *Macchiavello v. ABB/CON-CISE Optical Grp., LLC,* No. 22-cv-08468 (VB), 2023 WL 4625009, at *4 (S.D.N.Y. July 19, 2023) (finding standing for late wage claim where the "plaintiff [went] beyond what is required by Supreme Court and Second Circuit precedent and alleges delayed wages prevented her and class members from spending money on everyday expenses such as groceries, rent, and mortgage payments"); *Espinal v. Sephora USA, Inc.,* No. 22-cv-03034 (PAE) (GWG), 2022 WL 16973328, at *4 (S.D.N.Y. Nov. 16, 2022) (finding standing where the plaintiffs "pled injury through the allegation that they were denied the ability to 'invest, earn interest on, otherwise use' the money from the wages they were owed"), *report and recommendation adopted*, No. 22-cv-03034 (PAE) (GWG), 2023 WL 2136392 (S.D.N.Y. Feb. 21, 2023).[4]

---

[4] Thus, Defendants' reliance on *Rosario I* to contest Plaintiff's standing to bring a late wage claim, Br. at 20, is misplaced because they ignore *Rosario II* and the similarity between Plaintiff's claims here and those found to be sufficient to plead standing in *Rosario II*.  *See*

Therefore, the Court denies Defendants' motion to dismiss Plaintiff's Tenth and Twelfth Causes of Action.

## CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED.  IT IS HEREBY ORDERED that Defendants shall file their answer to Plaintiff's SAC no later than **21 days** after the date of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 54.

Dated:  September 19, 2023
New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge

---

*Rosario II*, 2022 WL 17553319, at *2-4 (holding that allegations of losing the time value of money and opportunity to invest wages was sufficient for standing on late wages claim).  The remaining cases cited by Defendants are outside this Circuit, before *TransUnion*, or both.  *See* Br. at 20 (citing *Kawa Orthodontics, LLP v. Sec., U.S. Dep't Treasury*, 773 F.3d 243 (11th Cir. 2014); *Barber v. Lincoln Nat'l Life Ins. Co.*, 260 F. Supp. 3d 855 (W.D. Ky. 2017); *Epstein v. JPMorgan Chase & Co.*, No. 13-cv-04744 (KPF), 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014)).  In any event, Defendants rely on these cases for the proposition that a plaintiff must allege concrete harm from late wages, such as losing out on the opportunity to invest, collect interest on, or otherwise use the money.  *See* Br. at 20.  Plaintiff has alleged precisely that.  *See* SAC ¶ 144.